**MIDWESTERN GAS TRANSMISSION COMPANY, a Delaware corporation, Plaintiff,**

v.

**William D. McCARTY, in his capacity as Commissioner of the Indiana Utility Regulatory Commission; David A. Hadley, in his capacity as Commissioner of the Indiana Utility Regulatory Commission; Judith G. Ripley, in her capacity as Commissioner of the Indiana Utility Regulatory Commission; Camie J. Swanson–Hull, in her capacity as Commissioner of the Indiana Utility Regulatory Commission; David E. Ziegner, in his capacity as Commissioner of the Indiana Utility Regulatory Commission; and Southern Indiana Gas and Electric, Company, an Indiana corporation, Defendants.**

No. IP 00–0592–C–H/G.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Nov. 13, 2000.

relevant part, over "the transportation of natural gas in interstate commerce," but not over "any other transportation . . . of natural gas or . . . the local distribution of natural gas. . . ." 15 U.S.C. § 717(b). Local distribution of natural gas is left to state regulation. Companies engaged in the interstate gas business have long sought to avoid state regulation of so-called "bypass" arrangements in which the interstate business bypasses a local gas distribution company and supplies gas directly to large industrial customers. Compare, *e.g., Panhandle Eastern Pipe Line Co. v. Michigan Public Service Comm'n,* 341 U.S. 329, 333, 71 S.Ct. 777, 95 L.Ed. 993 (1951) (holding that state could exercise jurisdiction over such bypass arrangements, at least where same entity both sold and transported gas to end user), with *Federal Power Comm'n v. Louisiana Power & Light Co.,* 406 U.S. 621, 632, 638, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972) (holding that federal commission had power to issue curtailment regulation that would affect pipeline owner's direct sales contracts with industrial customers based on interstate "transportation" jurisdiction, especially to protect interests of ultimate consumers). As a general rule, local gas distribution companies oppose such bypass arrangements, which take away big customers and substantial revenues and rate base from those companies, which are required to serve all customers in a given area.

G. Daniel Kelley, Jr., Ice Miller Donadio & Ryan, Indianapolis, IN.

Beth H. Henkel, Deputy Attorney General, Indianapolis, IN.

Fred E. Schlegel, Baker & Daniels, Indianapolis, IN.

ENTRY ON ALL PENDING MOTIONS

HAMILTON, District Judge.

*Introduction*

The federal Natural Gas Act authorizes the Federal Energy Regulatory Commission (FERC) to exercise jurisdiction, in

The parties to this action disagree as to whether the Natural Gas Act applies to bar state regulation of bypass arrangements where the operator of an interstate natural gas pipeline delivers gas directly to the customer but does not also sell the gas to the customer. FERC, which is not a party to this case, and plaintiff Midwestern Gas Transmission Company (Midwestern) both say the federal law bars state regulation of such arrangements. Defendant Southern Indiana Gas and Electric Company (SIGECO) says it does not. The defendant Commissioners of the Indiana Utility Regulatory Commission have indicated

they agree with SIGECO, although their principal point is that they are entitled to decide the issue themselves and to have their decision reviewed through normal processes of judicial review. The line between federal and state regulatory jurisdiction over such bypass arrangements has considerable importance in the natural gas industry and to consumers, both large and small, of natural gas. As shown below, there is ample ground for reasonable disagreement on that issue.

The central issue in this case, however, is much narrower. Plaintiff Midwestern seeks an injunction to stop three administrative proceedings now pending before the Indiana Utility Regulatory Commission. The issue here is only whether federal law somehow bars the Indiana Commission from even considering the issue of its jurisdiction and from having its decisions subjected to ordinary judicial review through the Indiana courts and ultimately to the Supreme Court of the United States. As explained below, the answer is no. Abstention under *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), applies here, so that an injunction to stop the ongoing state proceedings is not warranted. The jurisdictional contest over natural gas bypass arrangements may go forward in the state proceedings and through the ordinary channels of judicial review. The court therefore denies plaintiff's request for injunctive relief and grants defendants' motions to dismiss this action.

### The Facts

Plaintiff Midwestern is a "natural-gas company" under the Natural Gas Act, 15 U.S.C. § 717a. The defendants are the SIGECO and the named Commissioners of the Indiana Utility Regulatory Commission (the "Indiana Commission"). Midwestern has contracted to transport natural gas directly to two large industrial users who buy the gas outside the state of Indiana. Those two industrial users, Grain Processing Corporation (GPC) and Scepter, Inc., are the ultimate consumers of the gas thus transported. GPC and Scepter do not purchase gas from Midwestern itself, however. The facilities of both GPC and Scepter lie within the geographic area that the Indiana Commission has allotted to SIGECO for local distribution of natural gas.

### I. The Indiana Statutes

Section 87 of the Indiana Public Service Commission Act of 1913, as amended, requires a certificate of necessity from the Indiana Commission before a "gas utility" may render "gas distribution service" in any rural area in the state of Indiana. Ind.Code § 8–1–2–87(c). A "gas utility" is defined as "any public utility selling or proposing to sell or furnish gas directly to any consumer or consumers within the state of Indiana for his, its or their domestic, commercial, or industrial use." Ind. Code § 8–1–2–87(a)(4). The term "gas distribution service" is defined in Section 87 to mean "the furnishing or sale of gas directly to any consumer within the state of Indiana for his or its domestic, commercial, or industrial use." Ind.Code § 8–1–2–87(a)(5). A gas utility seeking to provide such service must file an application with the Commission. The applicant has the burden of proving at a hearing that it has lawful power and authority to obtain the certificate, that it has the financial ability to provide the gas distribution service, that public "conveyance [sic] and necessity" require the rendering of the proposed service, and that the public interest will be served by issuing the certificate. Ind.Code § 8–1–2–87(d).

Indiana law also imposes more specific requirements that apply to so-called "bypass" arrangements like those at issue in this case. Specifically, Ind.Code § 8–1–2–87.5 ("Section 87.5") was enacted in 1985 and provides in part:

(b) Any person, corporation, or other entity that:

(1) is engaged in the transportation of gas from outside Indiana for direct sale

or delivery to any end use consumer or consumers within this state;

(2) is engaged in the transportation of gas solely within this state on behalf of any end use consumer or consumers; or

(3) is an end use consumer engaged in the transportation within this state of gas owned or acquired by such end use consumer for use in this state, other than transportation on the premises where the gas is consumed;

is a public utility as defined in [Ind.Code § 8-1-2-1] and must obtain a necessity certificate from the commission before it may engage in any activities described in this subsection. This subsection does not apply to a gas utility operating pursuant to an indeterminate permit or necessity certificate issued under [Ind. Code § 8-1-2-87], nor to the production, sale, and gathering of natural gas produced in Indiana.

In addition, Ind.Code § 8-1-2-87.6 governs the production, sale, gathering, and transportation of natural gas produced in Indiana. (The full text is set forth below in footnote 11 where the court addresses the dormant Commerce Clause issues raised with respect to Section 87.6.)

Midwestern owns and operates an interstate gas pipeline that operates in four states, including Indiana. Midwestern and SIGECO agree that Sections 87 and 87.5 by their terms apply to Midwestern's bypass arrangements with GPC and Scepter. Midwestern's pipeline is also connected to the SIGECO distribution system. SIGECO receives gas transported by Midwestern and then distributes that gas to SIGECO's customers, including residential, commercial, and industrial users.

## II. *Midwestern's Bypass Arrangements with GPC and Scepter*

GPC operates a facility for processing corn in a rural area of Daviess County, Indiana, which is in SIGECO's service area as designated by the Indiana Commission. Midwestern contracted with GPC to construct and operate a new pipeline 2.8 miles long that connects the GPC facility to Midwestern's interstate pipeline. Midwestern also agreed to transport through these pipelines to GPC natural gas that GPC purchases from out-of-state suppliers other than Midwestern. Midwestern does not sell natural gas to GPC. At the present time, the Midwestern connection to GPC is in operation and gas is being delivered to GPC through that connection.

Scepter, Inc. operates an industrial facility where it recycles aluminum scrap and dross in Knox County, Indiana, which is also in SIGECO's service area as designated by the Indiana Commission. Scepter built a pipeline from its facility across land owned by other persons to connect with Midwestern's interstate pipeline. See Hardy Aff., Ex. A. Midwestern contracted with Scepter to transport natural gas to Scepter that Scepter purchases from out-of-state suppliers other than Midwestern. Midwestern also does not sell natural gas to Scepter. Scepter built, owns, operates, and maintains the pipeline connecting its facility to the Midwestern interstate pipeline. See Hardy Aff. ¶ 3; Stokdyk Aff., Ex. C at 2. Before Scepter's direct connection to Midwestern was opened, Scepter received natural gas service from SIGECO. That connection from SIGECO has been closed, but it could be re-opened easily on short notice.

Midwestern contends that its connections with GPC and Scepter are under the sole regulatory jurisdiction of FERC, and that the federal Natural Gas Act preempts Indiana's Sections 87 and 87.5 as applied to such bypass connections. SIGECO disagrees. The jurisdictional dispute has generated several federal and state administrative proceedings.

## III. *Proceedings on the GPC Connection*

On May 12, 1998, Midwestern filed a request with FERC pursuant to the Natural Gas Act seeking authorization to provide gas transportation services to GPC.

SIGECO responded to public notice of the proceeding by filing a protest with FERC. SIGECO asserted that Midwestern's service to GPC would violate Sections 87 and 87.5 unless Midwestern first obtained a state necessity certificate from the Indiana Commission.

SIGECO also filed a petition directly with the Indiana Commission asking it to undertake an enforcement action under Ind.Code § 8-1-2-115 and to issue a cease and desist order to Midwestern unless and until Midwestern complied with Sections 87 and 87.5. Other gas utilities—Indiana Gas Company, NIPSCO, Citizens Gas, and Community Natural Gas—also intervened in that proceeding, as did GPC. In the state proceeding, Midwestern filed a motion with the Indiana Commission on July 20, 1998, to dismiss the proceeding for lack of jurisdiction. Midwestern also filed an alternative petition asking the Commission to certify the issue of preemption for an interlocutory appeal to the Indiana Court of Appeals. See Ind.Code § 8-1-3-10 (authorizing interlocutory appeals on questions of law certified by the Commission).

SIGECO asked FERC to defer its decision until after consideration of the issue by the Indiana Commission. FERC refused and claimed sole jurisdiction over the proposed bypass arrangement. On December 16, 1998, FERC issued authorization for Midwestern to proceed with the GPC contract. Midwestern then renewed its request for the Indiana Commission to dismiss the state proceedings. It also withdrew its petition for certification of the preemption issue to the Indiana Court of Appeals. On January 27, 1999, the Indiana Commission denied Midwestern's renewed request to dismiss the matter but stayed the proceedings to allow the preemption issue, then still before FERC on rehearing, to progress "through federal channels." [1]

On May 12, 1999, FERC denied SIGECO's request for a rehearing on the GPC matter. On August 21, 1999, FERC denied SIGECO's later request for reconsideration, as well. Under federal law, SIGECO and other parties to the FERC proceeding had the right to seek judicial review of FERC's decision in a United States Court of Appeals. See 15 U.S.C. § 717r(b). SIGECO did not file a notice of appeal to seek such review of FERC's order on the Midwestern–GPC bypass arrangement. The time for appeal has passed and the FERC determination has accordingly become final and unappealable. The Indiana Commission was formally notified of that fact on July 18, 2000. There is no indication in this court's record that SIGECO or Midwestern has asked the Indiana Commission to lift the stay of the state proceeding on the GPC bypass arrangement.

## IV. *Proceedings on the Scepter Connection*

On October 13, 1999, Midwestern applied to FERC for authorization concerning the contract with Scepter. SIGECO declined to intervene in that proceeding in any way. The application was automatically approved by FERC 45 days after filing in accordance with the Natural Gas Act and its regulations. Thus, neither SIGECO nor the Indiana Commission participated in the FERC proceeding on the Scepter bypass arrangement.

After FERC issued its approval, SIGECO filed two petitions with the Indiana Commission, one against Midwestern and one directly against Scepter. In the Midwestern proceeding, SIGECO asked the Commission to investigate the Scepter connection and to order Midwestern to cease and desist from rendering gas distribution service in a rural area unless and until it obtained a necessity certificate from the

---

1. After the Indiana Commission denied Midwestern's motion to dismiss, SIGECO also filed suit in the Knox Circuit Court challenging Knox County's issuance of a permit to

Midwestern to lay, maintain, and operate a pipeline within the county's right of way. That proceeding has also been stayed.

Commission to do so. In the Scepter case, SIGECO asked the Commission to investigate the matter and to order Scepter to cease and desist from transporting gas in violation of Ind.Code § 8–1–2–87.5(b)(3), which applies to a customer's transportation of gas across property other than the premises where the gas is consumed. On February 21, 2000, Midwestern filed a motion with the Indiana Commission for summary judgment in its case. Scepter did the same in its case. On April 10, 2000, Midwestern filed an initial complaint for declaratory relief and summary judgment in this court. Midwestern also sought a preliminary injunction. The court heard argument on that motion while the parties were beginning to brief other dispositive motions. In early May, Midwestern and Scepter filed motions with the Commission to stay its proceedings pending the result from this court.

### The Legal Issues

Midwestern seeks a declaration that FERC has exclusive jurisdiction over the bypass arrangements and an injunction prohibiting the Indiana Commissioners and SIGECO from taking further action regarding Midwestern, GPC, and Scepter, including the proceeding against Scepter to which Midwestern is not a party. SIGECO has moved to dismiss this action for lack of a ripe case or controversy. The Indiana Commissioners have moved to dismiss on the basis of Eleventh Amendment immunity for states and their officials acting in their official capacity. All defendants also contend that the court should abstain from issuing an injunction or deciding which agency has regulatory jurisdiction. Defendants rely primarily on the *Younger v. Harris* doctrine, which often applies when a federal court is asked to enjoin ongoing state proceedings. Finally, both sides have also filed motions for summary judgment as to whether the Indiana Commission may exercise jurisdiction over Midwestern's deliveries of gas to GPC and Scepter.

Because the ripeness issue affects subject matter jurisdiction under Article III of the Constitution, the court considers that issue first, then turns to the Eleventh Amendment defense and finally to the *Younger* abstention issue. Because the court finds that *Younger* abstention is required here, the court does not reach the parties' motions for summary judgment on the underlying jurisdictional dispute as between FERC and the Indiana Commission.

### I. A Ripe Case or Controversy

SIGECO contends first that the court must dismiss this action for lack of subject matter jurisdiction because there is no ripe case or controversy. SIGECO argues that the mere pendency of the proceedings before the Indiana Commission does not inflict any arguable injury on Midwestern, and that Midwestern is complaining only about possible effects that it might suffer if and when the Indiana Commission orders it to cease and desist from delivering gas to GPC and Scepter without a necessity certificate from the Commission. The court disagrees, essentially for reasons stated in *Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.*, 477 U.S. 619, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986), in which a state civil rights commission was investigating a complaint of sex discrimination by a teacher at a religious school. The school sought an injunction to stop the administrative proceeding, claiming that the proceeding itself violated the school's First Amendment rights to free exercise of religion. The Supreme Court addressed the ripeness issue in a footnote:

> We think that any ripeness challenge to appellees' complaint is foreclosed by *Steffel v. Thompson*, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974), and *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975). *Steffel* held that a reasonable threat of prosecution for conduct allegedly protected by the Constitution gives rise to a sufficiently ripe controversy. 415 U.S.

at 458–460, 94 S.Ct. 1209. If a reasonable threat of prosecution creates a ripe controversy, we fail to see how the actual filing of the administrative action threatening sanctions in this case does not. It is true that the administrative body may rule completely or partially in appellees' favor; but it was equally true that the plaintiffs in *Steffel* and *Doran* may have prevailed had they in fact been prosecuted.

477 U.S. at 625–26 n. 1, 106 S.Ct. 2718; see also *Younger v. Harris,* 401 U.S. at 41, 91 S.Ct. 746 (indictment and pending prosecution of federal plaintiff established "an acute, live controversy with the State and its prosecutor"). The same reasoning applies here. The state proceedings are not merely threatened. They are actually pending. The issues relevant to the underlying jurisdictional dispute are fully developed. The principal dispute is over which of several available routes toward a possible final resolution of that issue in the Supreme Court of the United States should be available. That dispute is better addressed in terms of *Younger* abstention. At least for purposes of declaratory relief, the case presents a ripe controversy involving sufficiently imminent threats of future harm to Midwestern resulting from the Indiana Commission proceedings.

## II. *The Eleventh Amendment*

Plaintiff Midwestern originally named as a defendant the Indiana Utility Regulatory Commission itself. In response to the Commission's motion to dismiss based on the Eleventh Amendment, Midwestern filed an amended complaint adding as defendants the five individual Commissioners in their official capacities. The Commissioners also contend the Eleventh Amendment bars relief against them.

■ The Eleventh Amendment provides that "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." The Supreme Court has held that the Eleventh Amendment bars not only those suits specifically covered by its wording but also suits brought against a state by the state's own citizens. The Amendment restricts a federal court from hearing damages actions against states or state officials acting in their official capacities. The Amendment also bars private individuals from bringing suit against states and state agencies in a federal court, with certain exceptions. See generally *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 267–69, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997) (noting that the "Court's recognition of sovereign immunity has not been limited to the suits described in the text of the Eleventh Amendment").

■ No exception applies to Midwestern's suit directly against the Indiana Utility Regulatory Commission itself. The Commission is therefore entitled to dismissal on Eleventh Amendment grounds. The court has modified the caption in this action to remove the Indiana Commission as a named party.

■ To pursue its claim for relief, Midwestern relies primarily on the doctrine of *Ex parte Young* to obtain injunctive and declaratory relief against the five Commissioners in their official capacities. Under *Ex parte Young,* an individual state officer may be sued in his or her official capacity to enjoin a prospective action under state law that would violate the Constitution. 209 U.S. 123, 159–160, 28 S.Ct. 441, 52 L.Ed. 714 (1908). As a matter of doctrine, *Ex parte Young* "treats state officials violating federal law 'as renegades acting ultra vires.'" *Dean Foods Co. v. Brancel,* 187 F.3d 609, 613 (7th Cir.1999), quoting *David B. v. McDonald,* 156 F.3d 780, 783 (7th Cir.1998). The doctrine is a species of legal fiction, but it is a venerable legal fiction that plays a central role in the relationship between federal law and state governments. "[W]here prospective relief is sought against individual state officers in a federal forum based on a federal right,

the Eleventh Amendment, in most cases, is not a bar." *Coeur d'Alene Tribe*, 521 U.S. at 276–77, 117 S.Ct. 2028 (opinion of Kennedy, J.); accord, *id.* at 294, 117 S.Ct. 2028 (opinion of O'Connor, J.).

The Indiana Commissioners contend that *Coeur d'Alene Tribe* foreshadows the future abandonment or sharp restriction of the rule of *Ex parte Young* so as to bar the present suit. This court disagrees. Justice O'Connor's concurring opinion, joined by Justices Scalia and Thomas, provided the narrowest grounds for the Court's decision and is therefore controlling. Justice O'Connor reasoned that the doctrine of *Ex parte Young* should not be extended to the unusual case presented by the tribe's action, which sought not only title to the state's land (the bed of Lake Coeur d'Alene) but also a determination that would extinguish forever the sovereign power of the State of Idaho over that property. 521 U.S. at 289, 117 S.Ct. 2028. In reaching that conclusion, however, Justice O'Connor plainly reaffirmed the vitality of *Ex parte Young* as that case has been applied for nearly a century. See *id.* at 291–96, 117 S.Ct. 2028. Simply put, a suit under *Ex parte Young* is available where a plaintiff alleges an ongoing violation of federal law and where the relief sought is prospective. See *id.* at 294, 117 S.Ct. 2028 (O'Connor, J., concurring); accord, *Alden v. Maine*, 527 U.S. 706, 757, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999) (where the relief sought is prospective and there is an ongoing violation of federal law, a suit under *Ex parte Young* is proper).

This analysis is also supported by *MCI Telecommunications Corp. v. Illinois Bell Telephone Co.*, 222 F.3d 323 (7th Cir.2000), in which the Seventh Circuit recently reaffirmed the vitality of *Ex parte Young* and rejected Eleventh Amendment arguments by state utility regulators similar to those raised here. The Seventh Circuit found that carriers' actions seeking prospective relief under federal law against state utility regulators in their official capacities presented a straightforward application of *Ex parte Young* that had not been undermined by *Coeur d'Alene Tribe.* 222 F.3d at 347–48; see also *Crenshaw v. Supreme Court of Indiana*, 170 F.3d 725, 729 (7th Cir.1999) (Eleventh Amendment required dismissal of state court and attorney disciplinary commission as defendants in constitutional challenge to procedures, but not claims against state officials named in their official capacities).

In this case, Midwestern seeks only prospective equitable relief against the named Indiana Commissioners in their official capacities, and this suit does not fall within the narrow exception to *Ex parte Young* recognized in *Coeur d'Alene Tribe.* The Eleventh Amendment therefore does not bar the action against the Commissioners in their official capacities.

## III. *Younger Abstention*

The defendant Commissioners and SIGECO contend that this court should abstain under *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), from issuing any injunction that would halt the ongoing proceedings before the Indiana Commission. As Midwestern points out: "Abstention from the exercise of federal jurisdiction is the exception, not the rule." *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 14, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983), quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). However, the *Younger* exception is well-established and often applies when federal courts are asked to enjoin state proceedings that are judicial in nature. "When confronted with circumstances that clearly implicate *Younger* concerns, a federal court must abstain." *Crenshaw v. Supreme Court of Indiana*, 170 F.3d at 730, quoting *Barichello v. McDonald*, 98 F.3d 948, 955 (7th Cir.1996).

In *Younger*, the Supreme Court held that a lower court had erred by enjoining a pending criminal prosecution in state court in the absence of bad faith, harassment, or

other extraordinary circumstances that would make the defense in the state criminal proceeding insufficient to protect the federal plaintiff's federal rights. 401 U.S. at 46, 53, 91 S.Ct. 746. The Supreme Court has extended *Younger* to bar federal court injunctions against ongoing state administrative proceedings where those proceedings are judicial in nature, implicate important state interests, and provide an adequate opportunity to raise constitutional challenges. See *Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.*, 477 U.S. 619, 627, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986); *Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982); accord, *Trust and Investment Advisers, Inc. v. Hogsett*, 43 F.3d 290, 295 (7th Cir.1994) (following *Middlesex County* ).

Midwestern argues that *Younger* abstention should not apply here for several reasons. Midwestern argues first that the Indiana Commission proceedings (a) do not involve important state interests, (b) are not judicial in nature, and (c) do not provide an adequate opportunity to present Midwestern's constitutional challenges. Midwestern also argues (d) that the court should apply an exception to *Younger* abstention because the Indiana Commission proceedings are "flagrantly and patently" unconstitutional and because they are attempts to "relitigate" rights and issues already determined by FERC. The court concludes that *Younger* abstention is appropriate here.

A. *Important State Interests*

■ The state proceedings here plainly implicate important state interests, both generally in the regulation of natural gas and specifically in the regulation of bypass arrangements with industrial customers. See, *e.g., General Motors Corp. v. Tracy*, 519 U.S. 278, 304–06, 117 S.Ct. 811, 136 L.Ed.2d 761 (1997) ("This Court has also recognized the importance of avoiding any jeopardy to service of the state-regulated captive market ...."), citing *Panhandle Eastern Pipe Line Co. v. Michigan Public Service Comm'n*, 341 U.S. 329, 71 S.Ct. 777, 95 L.Ed. 993 (1951), and *Panhandle Eastern Pipe Line Co. v. Public Service Comm'n of Indiana*, 332 U.S. 507, 68 S.Ct. 190, 92 L.Ed. 128 (1947). In both *Panhandle–Michigan* and *Panhandle–Indiana*, the Court held that states could exercise regulatory authority over bypass arrangements for large industrial gas customers, at least where the same entity both sold the gas and transported it directly to the customer. In *General Motors v. Tracy*, the Court was also addressing bypass arrangements, although in the context of a state tax that applied to bypass sales but not to other retail sales.

Midwestern argues that Indiana has no legitimate interest in "regulating interstate natural gas transportation." That argument is ultimately circular because it is based on the assumption that Midwestern's preferred view on the underlying jurisdictional argument will prevail. Indiana plainly has a sufficient interest in this subject matter to support application of *Younger* abstention if the other criteria are satisfied.

B. *Proceedings Judicial in Nature*

■ The three proceedings before the Indiana Commission were initiated by SIGECO filing petitions asking the Commission to order Midwestern and Scepter to cease and desist from alleged violations of Indiana law. See Ind.Code § 8–1–2–115 (Commission's enforcement authority). The potential results of these proceedings would include orders from the Indiana Commission that would be enforceable in the state courts. Also, violations of Indiana public utility laws can lead to civil liability and to penalties for infractions. See Ind.Code §§ 8–1–2–107 and 8–1–2–109. The Seventh Circuit has recognized that, for purposes of *Younger* abstention, administrative proceedings are "judicial in nature" when they are coercive, such as with "state enforcement proceedings," as

distinct from remedial or legislative proceedings. *Majors v. Engelbrecht,* 149 F.3d 709, 712 (7th Cir.1998) (state professional licensing proceeding was judicial in nature).

Midwestern argues that the Indiana Commission proceedings should be deemed legislative proceedings beyond the reach of *Younger* because they are essentially no different from proceedings on whether to issue a certificate of necessity, which would be deemed legislative in nature for purposes of state law. See *General Telephone Co. of Indiana v. Public Service Comm'n,* 238 Ind. 646, 150 N.E.2d 891, 894 (1958) ("The allocation of a utility service area is a legislative function."). In *New Orleans Public Service, Inc. v. Council of City of New Orleans,* 491 U.S. 350, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989), the Supreme Court addressed what it means for an administrative proceeding to be judicial in nature for *Younger* purposes. The specific question in *New Orleans* was whether a city council's proceeding that resulted in a determination regarding a public utility's request for a rate increase should be treated as judicial in nature. The Court held that the city council proceeding was legislative in nature and that *Younger* abstention was not appropriate: "A judicial inquiry investigates, declares and enforces liabilities as they stand on present or past facts and under laws supposed already to exist. That is its purpose and end.... [T]he making of a rule for the future ... is an act legislative and not judicial in kind." *New Orleans,* 491 U.S. at 370–71, 109 S.Ct. 2506, quoting *Prentis v. Atlantic Coast Line Co.,* 211 U.S. 210, 226, 29 S.Ct. 67, 53 L.Ed. 150 (1908). The Court recognized that it had long treated utility ratemaking as "an essentially legislative act." 491 U.S. at 371, 109 S.Ct. 2506.

Midwestern asserts that the Indiana certification process under Sections 87 and 87.5 is legislative in nature, similar to the rate-making function of the city council in *New Orleans.* However, the test in *New Orleans* looks to the outcome of the proceeding—the result contemplated by the process defines its nature. The outcome of the process in *New Orleans* was a change in the public utility's rates. The ultimate results of the Indiana Commission proceedings here will not be a "rule for the future." The Commission has already carried out the "legislative" function of allocating a utility service area. Rather, the Commission has been asked to decide whether specific facts violate Indiana law and, if so, to decide upon appropriate penalties and enforcement mechanisms. Those circumstances distinguish this case from *Alleghany Corp. v. Haase,* 896 F.2d 1046, 1053 (7th Cir.1990), in which the Seventh Circuit held that a state administrative proceeding on whether to approve the sale of an insurance holding company was legislative in nature and thus could not support *Younger* abstention.[2]

The Commission will make those decisions about penalties and enforcement mechanisms through a process in which the parties charged with violating law have the rights to be heard, to present evidence, to cross-examine adverse witnesses, and so on. In Justice Holmes' words from *Prentis v. Atlantic Coast Line,* the Commission has been asked to investigate, declare, and enforce liabilities as they stand on present or past facts and under laws supposed already to exist. The Indiana Commission proceedings are judicial in nature for purposes of *Younger* abstention.

### C. Adequate Forum for Constitutional Issues

▪ *Younger* abstention in deference to ongoing state proceedings is not appropri-

---

**2.** The Seventh Circuit's decision in *Alleghany Corp.* was ultimately vacated as moot, see *Dillon v. Alleghany Corp.,* 499 U.S. 933, 111 S.Ct. 1383, 113 L.Ed.2d 441 (1991), but the

Seventh Circuit has continued to treat the opinion as authoritative. See, *e.g., Majors v. Engelbrecht,* 149 F.3d at 712; *Hinrichs v. Whitburn,* 975 F.2d 1329, 1333 (7th Cir.1992).

ate if the state proceedings do not provide an adequate forum for hearing the federal constitutional issues being raised in the federal lawsuit. See *Younger*, 401 U.S. at 49, 91 S.Ct. 746 (state prosecution would give Harris "an opportunity to raise his constitutional claims"). As a general rule, of course, federal courts recognize that state courts are fully capable of and responsible for interpreting and following the United States Constitution. "[I]t has been perfectly natural for our cases to repeat time and time again that the normal thing to do when federal courts are asked to enjoin pending proceedings in state courts is not to issue such injunctions." *Id.* at 45, 91 S.Ct. 746. "Minimal respect for the state processes, of course, precludes any *presumption* that the state courts will not safeguard federal constitutional rights." *Middlesex County*, 457 U.S. at 431, 102 S.Ct. 2515 (emphasis in original).

■■■ A complication here is the possibility that the Indiana Commission will conclude that it is not authorized under state law to pass on the constitutionality of state statutes. See *General Motors Corp. v. Indianapolis Power & Light Co.*, 654 N.E.2d 752, 763 n. 2 (Ind.App.1995) (Commission did not have jurisdiction to adjudicate challenge to constitutionality of statute underlying its order); cf. *Alleghany Corp. v. Haase*, 896 F.2d at 1054 (Easterbrook, J., concurring) ("No one believes these days that legislative and executive branches of state governments may ignore the Constitution and federal law until slapped with an injunction."). Even if state law bars the Commission itself from deciding the constitutionality of a state statute, however, that would not be controlling here, as shown by the Supreme Court's decision in *Dayton Christian Schools, supra*. In that case, private schools claimed they were being subjected to state administrative proceedings in violation of their First Amendment rights. The schools argued that state law prohibited the state administrative body from con-

sidering constitutional defenses to otherwise applicable law. 477 U.S. at 629, 106 S.Ct. 2718.

The Supreme Court was skeptical of the argument, noting that it "would seem an unusual doctrine ... to say that the Commission could not construe its own statutory mandate in the light of federal constitutional principles." *Id.* Nevertheless, the asserted limit would not have affected the outcome of the case even it were actually in effect: "In any event, it is sufficient under *Middlesex* [*County*, 457 U.S. at 436, 102 S.Ct. 2515], that constitutional claims may be raised in state-court judicial review of the administrative proceeding." *Id.* In the *Middlesex County* case, in turn, the Court had deemed it sufficient for purposes of *Younger* abstention that constitutional challenges to state bar disciplinary matters could be presented to the state supreme court, either by interlocutory appeal or on appeal from a final decision. 457 U.S. at 436 & n. 15, 102 S.Ct. 2515.

Similarly here, even if the Commission were to decide it does not have the power to consider the constitutionality of applying the Indiana statutes to Midwestern and Scepter, the Commission clearly has the ability to certify such questions of law to the Indiana Court of Appeals for decision. Ind.Code § 8–1–3–10. Even if the Commission chose not to take the step, the constitutional issues Midwestern wishes to present here could be heard on judicial review of any enforcement action taken. The Indiana courts are fully capable of deciding those issues. See, *e.g.*, *General Motors Corp. v. Indianapolis Power & Light Co.*, 654 N.E.2d at 763 (addressing Commerce Clause challenges to state statutes that Commission could not decide).

In addition, the judicial review process will provide Midwestern an opportunity for a federal forum for its constitutional claims. Like any litigant in a state court, if Midwestern is ultimately disappointed with the result in the state courts, it may file a certiorari petition with the Supreme Court of the United States. Because state

enforcement proceedings are pending, however, the mere assertion of a constitutional claim simply is not sufficient to require a federal court to halt those state proceedings. See *New Orleans,* 491 U.S. at 365, 109 S.Ct. 2506 ("[I]t is clear that the mere assertion of a substantial constitutional challenge to state action will not alone compel the exercise of federal jurisdiction."); *Alleghany Corp.,* 896 F.2d at 1051–53 (explaining that while administrative officials may be limited in their ability to interpret the Constitution, the defendant in an ongoing state enforcement proceeding is not at liberty to enjoin the state by turning to the federal courts on those grounds).

### D. *Exceptions to Younger Abstention*

 Thus, the basic elements of *Younger* abstention are present in this case: ongoing proceedings are judicial in nature, involve important state interests, and provide a suitable forum for hearing Midwestern's federal constitutional challenges to Indiana law. However, the doctrine of abstention remains equitable in nature. *Younger* abstention may not be appropriate in certain exceptional circumstances, such as where the state proceedings are being pursued in bad faith or based on a desire to harass the opponent, or where the challenged state statute is "flagrantly and patently" unconstitutional. See *Middlesex County,* 457 U.S. at 429, 102 S.Ct. 2515; *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 611, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975); *Younger v. Harris,* 401 U.S. at 53–54, 91 S.Ct. 746.

 Midwestern argues that SIGECO is acting in bad faith and for the purpose of harassing it. The argument is founded upon Midwestern's view of the merits and its belief that SIGECO should simply acquiesce after FERC and several federal circuits have rejected the arguments it raises.

The court finds no evidence of harassment or bad faith on the part of SIGECO, let alone the Indiana Commissioners. To contest the jurisdictional issue, SIGECO filed before the Indiana Commission and chose the forum it believes best protects its interests, just as Midwestern chose FERC as the forum that best protected its interests. If the Indiana statutes are valid, facts in this record provide ample reason to believe Midwestern and Scepter are in violation of Indiana law, to the detriment of SIGECO. SIGECO was entitled to turn to the Commission to seek enforcement of the state laws. Both SIGECO and the Commissioners are certainly aware of the debate over the scope of state and FERC jurisdiction. Neither SIGECO nor the Commissioners are required to defer to FERC proceedings and judicial review of FERC decisions as the sole procedure for resolving those issues.

 Furthermore, a "plaintiff asserting bad faith prosecution as an exception to *Younger* abstention must allege specific facts to support an inference of bad faith.... This specific evidence must show that state prosecution was brought in bad faith for the purpose of retaliating for or deterring the exercise of constitutionally protected rights." *Collins v. County of Kendall, Illinois,* 807 F.2d 95, 98 (7th Cir. 1986) (internal quotation omitted).[3] No specific evidence of this nature has been presented by Midwestern. Certainly Midwestern has offered no support for its extraordinary assertion, see Hearing Tr. at 27–28, that the sole avenue open to the Indiana Commission itself to resolve these jurisdictional disputes is to intervene in

---

3. In *Collins,* the court held that 34 state criminal prosecutions in two years did not establish bad faith where some resulted in convictions, some in acquittals, some in dismissals, and others were still pending. 807 F.2d at 98–99. Midwestern would have to produce far more than the conclusory assertion that SIGECO launched the state proceedings in bad faith. See also *Juidice v. Vail,* 430 U.S. 327, 338, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977) ("This exception may not be [used] unless it is alleged and proved that they are enforcing the ... [state] procedures in bad faith or are motivated by a desire to harass.").

FERC's own administrative proceedings and then to appeal from adverse rulings.

As to extraordinary circumstances, "whatever else is required, such circumstances must be 'extraordinary' in the sense of creating an extraordinarily pressing need for immediate federal equitable relief, not merely in the sense of presenting a highly unusual factual situation." *Moore v. Sims,* 442 U.S. 415, 433, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979), quoting *Kugler v. Helfant,* 421 U.S. 117, 125, 95 S.Ct. 1524, 44 L.Ed.2d 15 (1975). Midwestern has not shown such an extraordinarily pressing need for immediate federal equitable relief.

Midwestern's principal argument against *Younger* abstention is that the Indiana statutes governing bypass arrangements are "flagrantly and patently" unconstitutional because they are preempted by the Natural Gas Act and violate the dormant Commerce Clause. The Supreme Court has repeatedly said that patent unconstitutionality is an exception for *Younger* abstention, but actual applications of the exception are few and far between. See *New Orleans Public Service,* 491 U.S. at 367, 109 S.Ct. 2506 (assuming without deciding that a "facially conclusive claim" of federal preemption would render abstention inappropriate); *Younger,* 401 U.S. at 53–54, 91 S.Ct. 746 (federal plaintiff might show irreparable injury by showing that challenged statute is "flagrantly and patently violative of express constitutional prohibitions"), quoting *Watson v. Buck,* 313 U.S. 387, 402, 61 S.Ct. 962, 85 L.Ed. 1416 (1941); *Public Utilities Comm'n of Ohio v. United Fuel Gas Co.,* 317 U.S. 456, 469, 63 S.Ct. 369, 87 L.Ed. 396 (1943) (before *Younger,* affirming injunction to stop state commission from attempting directly to regulate interstate gas prices). The court considers first the issue of preemption under the Natural Gas Act, then the dormant Commerce Clause issue. The court then turns to Midwestern's argument that *Younger* abstention should not apply because the Commission proceedings are an effort to "relitigate" matters that FERC has already decided.

### 1. *Preemption under the Natural Gas Act*

 On the central jurisdictional issue, Midwestern contends its bypass arrangements with GPC and Scepter involve only "the transportation of natural gas in interstate commerce," which is a matter for FERC under the Natural Gas Act, 15 U.S.C. § 717(b). SIGECO contends that the bypass arrangements amount to "the local distribution of natural gas," the regulation of which is left to the states. *Id.*

The Supreme Court's decisions in the two *Panhandle* cases provide a good starting point for understanding the jurisdictional dispute. Both dealt with an interstate pipeline's efforts to bypass local distribution companies to serve industrial customers directly. See *Panhandle Eastern Pipe Line Co. v. Michigan Public Service Comm'n,* 341 U.S. 329, 71 S.Ct. 777, 95 L.Ed. 993 (1951) (*"Panhandle–Michigan"*); *Panhandle Eastern Pipe Line Co. v. Public Service Comm'n of Indiana,* 332 U.S. 507, 68 S.Ct. 190, 92 L.Ed. 128 (1947) (*"Panhandle–Indiana"*).

In *Panhandle–Indiana* the Court held without dissent that the Natural Gas Act did not bar the Indiana Commission from exercising jurisdiction over a bypass arrangement in which an interstate pipeline was selling and delivering gas directly to a large industrial customer. The Court acknowledged that the sales were "interstate transactions" that *could* be regulated by Congress. 332 U.S. at 512–13, 68 S.Ct. 190. Summarizing the history of its own Commerce Clause decisions on the gas industry, however, the Court explained that the Natural Gas Act was enacted not to exercise the full scope of the federal commerce power, but only to exercise federal jurisdiction over those aspects of the industry that the Court itself had held were not subject to state regulation. *Id.* at 514–17, 68 S.Ct. 190; see also *id.* at 519, 68 S.Ct. 190 ("Congress, it is true, occu-

pied a field. But it was meticulous to take in only territory which this Court had held the states could not reach."). The Court found that the Natural Gas Act drew the jurisdictional line "sharply and cleanly between sales for resale and direct sales for consumptive uses." *Id.* at 517, 68 S.Ct. 190. The Court concluded:

> It would be an exceedingly incongruous result if a statute so motivated, designed and shaped to bring about more effective regulation, and particularly more effective state regulation, were construed in the teeth of those objects, and the import of its wording as well, to cut down regulatory power and to do so in a manner making the states less capable of regulation than before the statute's adoption.

*Id.* at 519, 68 S.Ct. 190. The Court pointed out that the primary aims of the Natural Gas Act were to protect consumers against exploitation at the hands of natural gas companies and to establish cooperative action between federal and state agencies. "It could accomplish neither that protective aim nor the comprehensive and effective dual regulation Congress had in mind, if those companies could divert at will all or the cream of their business to unregulated industrial uses." *Id.* at 521, 68 S.Ct. 190.

Four years later the Supreme Court revisited the subject of bypass arrangements in *Panhandle–Michigan.* There the Court upheld a state commission's order requiring a certificate of necessity before an interstate pipeline could sell gas directly to a large industrial customer that was already served by a local distribution company. Following *Panhandle–Indiana,* the Court held that such sales were sales in interstate commerce but were subject to state regulatory jurisdiction because Congress had not exercised the full scope of its commerce power, but had sought to occupy only that portion of the field that the Court itself had barred states from regulating. 341 U.S. at 333–35, 71 S.Ct. 777. The Court again recognized the substantial interest that states have in such bypass arrangements:

> The facts in the instant case show that the proposed sales are primarily of local interest. They emphasize the need for local regulation and the wisdom of the principles just discussed. To accommodate its operations, appellant proposes to use the streets and alleys of Detroit and environs. A local utility already operating in the same area, Consolidated, receives its entire supply of natural gas from appellant. A substantial portion of Consolidated's revenues is derived from sales to large industrial consumers. Appellant ignored requests of Consolidated for additional gas to meet the increased wants of its industrial customers. Instead of attempting to meet increased needs through Consolidated, appellant launched a program to secure for itself large industrial accounts from customers, some of whom were already being served by Consolidated. In connection with the Ford Motor Company, it is noteworthy that the tap line by which appellant proposed to serve Ford directly would be substantially parallel to and only a short distance from the existing tap line by which Consolidated now serves Ford.

> Thus, not only would there be two utilities using local facilities to accommodate their distribution systems, but they would be seeking to serve the same industrial consumers. Appellant asserts a right to compete for the cream of the volume business without regard to the local public convenience or necessity. Were appellant successful in this venture, it would no doubt be reflected adversely in Consolidated's over-all costs of service and its rates to customers whose only source of supply is Consolidated. This clearly presents a situation of "essentially local" concern and of vital interest to the State of Michigan.

*Id.* at 333–34, 71 S.Ct. 777.

*Panhandle–Indiana* and *Panhandle–Michigan* both involved bypass arrange-

ments in which the same entity both sold and transported the gas in question directly to industrial customers. In both cases the Supreme Court held that the transactions fell outside the Natural Gas Act's grant of federal jurisdiction over "the sale in interstate commerce of natural gas for resale...." 15 U.S.C. § 717(b). The state interests identified by the Court do not appear to depend at all, however, on whether the seller and transporter of the gas are the same entity, two related entities, or two unrelated entities.

Nevertheless, Midwestern argues, and FERC has concluded, that the holdings and reasoning of the *Panhandle* cases do not extend to an interstate pipeline's transportation of natural gas directly to an industrial customer so long as the pipeline company itself did not also sell the gas. Midwestern and FERC contend that the pipeline company is then engaged only in the "transportation of natural gas in interstate commerce," and not the "local distribution of natural gas" for purposes of 15 U.S.C. § 717(b). FERC's position is set forth in its order approving Midwestern's bypass arrangement with GPC. *In re Midwestern Gas Transmission Co.*, 85 F.E.R.C. ¶ 61,358, 1998 FERC Lexis 2574, *12–*16 (1998) (Ex. A to amended complaint). Midwestern supports this argument primarily with the line-up of the Sixth, Tenth, and District of Columbia Circuits, which have agreed with FERC that states may not regulate bypass arrangements, at least where the customer buys

the gas from some entity other than the pipeline operator. These circuits addressed bypass arrangements in circumstances that cannot be distinguished from Midwestern's arrangements with GPC and Scepter.[4]

In *Public Utilities Comm'n of California v. FERC*, 900 F.2d 269, 273–77 (D.C.Cir.1990), the District of Columbia Circuit rejected California's attempt to assert concurrent jurisdiction with FERC over the in-state gas taps and tie-in facilities that linked an interstate gas pipeline to an industrial end-user. Accord, *Public Utilities Comm'n of California v. FERC*, 143 F.3d 610, 617 (D.C.Cir.1998) (reaffirming holding that there is no concurrent jurisdiction under Natural Gas Act); *Michigan Consolidated Gas Co. v. FERC*, 883 F.2d 117, 121–22 (D.C.Cir.1989) (upholding FERC's exercise of jurisdiction to approve bypass arrangement despite apparent reversal of long-standing agency position on bypass issues). In *Cascade Natural Gas Corp. v. FERC*, 955 F.2d 1412, 1419–21 (10th Cir.1992), the Tenth Circuit rejected another state's effort to assert concurrent jurisdiction over an industrial customer's construction of a tap and meter facility connecting to an interstate pipeline. In *Michigan Consolidated Gas Co. v. Panhandle Eastern Pipe Line Co.*, 887 F.2d 1295, 1298–1301 (6th Cir. 1989), the Sixth Circuit affirmed a district court injunction against the state regulatory commission's effort to assert jurisdiction over bypass arrangements.[5]

---

**4.** Midwestern actually argues that five circuits agree with it, also citing decisions of the Second and Fourth Circuits. In *National Fuel Gas Supply Corp. v. Public Service Comm'n of New York*, 894 F.2d 571, 579 (2d Cir.1990), the Second Circuit held that New York's law requiring state environmental approval for a bypass pipeline project was preempted by the federal Natural Gas Act. In *Public Service Comm'n of West Virginia v. Federal Power Comm'n*, 437 F.2d 1234, 1237–38 (4th Cir. 1971), the Fourth Circuit held that a state could not exercise jurisdiction over a transaction involving the lease of a pipeline used for both interstate and intrastate activities where the lease involved only interstate rights. As

compared to the opinions discussed in the text, however, these opinions did not address the arguments and authorities at the core of the dispute in this case and so provide little additional weight to Midwestern's arguments.

**5.** *Michigan Consolidated Gas* arose in a procedural context similar to this case—a request to enjoin state enforcement proceedings after FERC had approved the bypass in question. (In fact, FERC's decision had been upheld by the District of Columbia Circuit in *Michigan Consolidated Gas v. FERC*, supra, 883 F.2d 117.) However, the Sixth Circuit was careful to note that no party had raised any issue of

These circuit court opinions have given careful and thoughtful attention, based on a long history of statutes and Supreme Court decisions, to just where the line between federal and state jurisdiction should be drawn with respect to bypass arrangements. In *Public Utilities Commission of California*, the District of Columbia Circuit relied primarily on *Federal Power Comm'n v. East Ohio Gas Co.*, 338 U.S. 464, 70 S.Ct. 266, 94 L.Ed. 268 (1950), to draw the line based on the size of pipes and the pressure levels in them. See 900 F.2d at 275–77 (FERC could exercise jurisdiction over "high-pressure trunk lines to the point where pressure was reduced and the gas entered local mains"), quoting *East Ohio Gas*, 338 U.S. at 470, 70 S.Ct. 266. The District of Columbia Circuit acknowledged that the *Panhandle* cases authorized state jurisdiction over bypass arrangements where the interstate pipeline operator was itself the seller of gas, but the court held that the industry practice of using separate companies to sell and transport the gas "removes this fulcrum for state power." 900 F.2d at 277. The court explained:

> We do not believe that this industry transition calls for a modification of *East Ohio*, or for finding it, *despite the Court's language*, limited to high pressure transmission *without delivery to an end user*. Despite the transition, the state of California has authority over the gas once it moves beyond the high-pressure mains into the hands of an end user. It may well also have authority at the moment of delivery to low-pressure facilities for transmission to end users, a point not before us but seemingly implied by *East Ohio*.

*Id.* (emphasis added). Thus, the District of Columbia Circuit extended *East Ohio Gas* beyond its language to hold, in essence, that as long as the gas is delivered to the industrial end-user in a large, high-pressure pipeline, FERC has jurisdiction and the state does not. But see *Panhan-*

*dle–Indiana*, 332 U.S. at 513, 68 S.Ct. 190 ("Neither practical common sense nor constitutional sense would tolerate holding that reduction in pressure makes the industrial sales to Anchor–Hocking wholly intrastate for purposes of local regulation while deliveries at similar pressures to utility companies remain exclusively interstate. Variations in main pressure are not the criterion of the states' regulatory powers under the commerce clause.").

The Tenth Circuit reached the same result in *Cascade Natural Gas*, but by different reasoning. The Tenth Circuit chose not to follow the District of Columbia Circuit's reliance on the mechanical, pressure-based test of *East Ohio*. See 955 F.2d at 1420–21 & n. 9. The Tenth Circuit instead applied a distinction between wholesale and retail sales, doing so in a way that limited state jurisdiction to local retail sales, excluding delivery to industrial customers where the customers have purchased gas in other states from entities other than the pipeline operator. *Id.* at 1421 ("While delivery by Northwest and delivery by Cascade are similar in that both result in the final local delivery for consumptive use, a local retail sale is conspicuously missing."). The Tenth Circuit focused on the Natural Gas Act's grant of jurisdiction to FERC over "the transportation of natural gas in interstate commerce," and relied on the Supreme Court's statement: "Gas crossing a state line at any stage of its movement to the ultimate consumer is in interstate commerce during the entire journey." *Id.* at 1417, quoting *Maryland v. Louisiana*, 451 U.S. 725, 755, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981). The Tenth Circuit also suggested that if the change in industry practices had undermined the assumptions on which the Natural Gas Act had been based, it was up to Congress to reign in FERC's jurisdiction. 955 F.2d at 1421.

In *Michigan Consolidated Gas*, the Sixth Circuit relied primarily on the quoted language from *Maryland v. Louisiana*

abstention, so the court did not address the issue. 887 F.2d at 1302 n. 3.

and held that a bypass arrangement involving a seller distinct from the pipeline operator involved "interstate transportation" within the meaning of the Natural Gas Act, 15 U.S.C. § 717(b). See 887 F.2d at 1299–1300. The court went on to conclude that, because FERC had jurisdiction over the arrangement, the state could not exercise jurisdiction over it.[6]

 This line-up of federal circuit courts and the federal regulatory body deserves respect and careful consideration. The Seventh Circuit has often said that district courts in this circuit should "give most respectful consideration to the decisions of the other courts of appeals and follow them whenever [they] can." *E.G., Colby v. J.C. Penney Co.*, 811 F.2d 1119, 1123 (7th Cir.1987). Similarly, a federal agency's interpretation of an ambiguous statute it is charged with enforcing generally deserves considerable deference from the courts. See *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

 There are limits to such deference, however. District courts should not follow other circuits uncritically, as the Seventh Circuit recently instructed in *Citizens for a Better Environment v. Steel Co.*, 230 F.3d 923, 927–928 (7th Cir.2000). There the appellate court disagreed with a district court that had relied on decisions of other circuits that did not explain persuasively their conclusions on the key issue. The parties before each federal court are entitled to that court's best judgment about a contested issue of law. See *Atchison, Topeka & Santa Fe Ry. Co. v. Pena*, 44 F.3d 437, 443 (7th Cir.1994) (*en banc*) ("Our duty is to independently decide our own cases, which sometimes results in disagreements with decisions of the other circuits."), *aff'd sub nom. Brotherhood of Locomotive Engineers v. Atchison, Topeka & Santa Fe Ry. Co.*, 516 U.S. 152, 116 S.Ct. 595, 133 L.Ed.2d 535 (1996). Although that judgment should be informed by decisions from other courts that do not directly control the court making the decision, a court cannot avoid responsibility for making its own decision by merely pointing out that other courts have decided the issue in a certain way.

Similarly, the Seventh Circuit has written that deference to an agency under *Chevron* is not appropriate with respect to an agency's (expansive) interpretation of its own jurisdiction. *United Transportation Union–Illinois Legislative Bd. v. Surface Transportation Bd.*, 169 F.3d 474, 477 (7th Cir.1999) (*dicta*); *Midland Coal Co. v. Director, Office of Workers' Comp. Programs*, 149 F.3d 558, 561 (7th Cir.1998) (*Chevron* deference "does not extend" to questions of an agency's jurisdiction).[7]

---

6. Midwestern Gas also suggests that the Seventh Circuit adopted similar reasoning with respect to electricity in *Wisconsin–Michigan Power Co. v. Federal Power Comm'n*, 197 F.2d 472 (7th Cir.1952). The Seventh Circuit held in that case that transfers of electricity across state lines between a power company's generators, for purposes of sales to local utilities that would in turn resell the power to the public, were transfers in interstate commerce subject to federal regulation. The court's opinion offers some limited support for both sides in this case, but it does not address the issue of bypass arrangements with respect to gas or electricity. The Seventh Circuit followed the obvious and strong parallels between the federal Natural Gas Act and the Federal Power Act, 197 F.2d at 476, and it recognized that the federal legislation was intended "to place in the Federal Commission jurisdiction which never belonged to the states, that is, sales from interstate commerce to wholesalers for resale." *Id.* at 477. The court never had occasion to address whether the federal government or state government would have jurisdiction over arrangements through which an end-user purchased electricity (or gas) in another state and made arrangements with an entity other than the seller to deliver the electricity (or gas).

7. Compare *Mississippi Power & Light Co. v. Mississippi*, 487 U.S. 354, 380–81, 108 S.Ct. 2428, 101 L.Ed.2d 322 (1988) (Scalia, J., concurring in the judgment) (*Chevron* deference applies to an agency interpretation of limits on its statutory jurisdiction), with *id.* at 386–87, 108 S.Ct. 2428 (Brennan, J., dissenting)

Even more to the point, the principle of deference under *Chevron* is, at bottom, a rule of statutory construction. See *Chevron*, 467 U.S. at 843 n. 9, 104 S.Ct. 2778 ("If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect."). With respect to the federal Natural Gas Act, the Supreme Court has repeatedly traced and followed the congressional indications that the act was not intended to exercise the full scope of federal power over interstate commerce. It was intended instead only to fill the regulatory gap left by the Supreme Court's own decisions barring states from regulating in certain situations involving interstate commerce. See, *e.g.*, *Panhandle–Indiana*, 332 U.S. at 514–17, 68 S.Ct. 190. Under the Supreme Court's reading of the Natural Gas Act's jurisdictional grant in 15 U.S.C. § 717(b), one could reasonably argue that the *Chevron* principle of deference does not even come into play, and that FERC's expansive view of its own jurisdiction over bypass arrangements is simply wrong. There is considerable support for that argument, as defendants have explained in their briefs.

The defendants build their arguments primarily on the Supreme Court's *Panhandle–Michigan* and *Panhandle–Indiana* decisions holding that states could exercise jurisdiction over bypass arrangements, at least so long as the same entity both sold the gas and transported it to the industrial end user. The defendants contend there is no persuasive reason to treat such bypass arrangements any differently based solely on the fact that the seller and the transporter of the gas are two distinct legal entities.

(*Chevron* deference does not apply to agency's jurisdictional determinations).

**8.** The *Tracy* Court noted, for example, that where municipalities allowed multiple gas franchisees to serve the same areas, the "predictable and disastrous" results were wasteful as competitors built parallel delivery systems and continually tore up streets to do so. 519

Under Midwestern's and FERC's analysis of this issue, federal jurisdiction would be exclusive even if the seller and transporter were two wholly-owned subsidiaries of the same parent company. Certainly the states' interests in regulating bypass arrangements, as set forth in the *Panhandle* decisions, are not affected at all by a legal separation between the seller and the transporter.

The defendants therefore contend that the appropriate line for state regulation is to permit state regulation of delivery (as well as sale) to any end-user, such as GPC and Scepter in this case, as well as over in-state facilities linking the interstate pipeline to the end-user. Defendants contend these activities are "the local distribution of natural gas" under 15 U.S.C. § 717(b). In addition, following the analysis in *Panhandle–Indiana* and *Panhandle–Michigan*, where the question under 15 U.S.C. § 717(b) is whether a state could regulate the particular matter in question even if FERC did not exist, there is surely no doubt that a state could exercise legal and regulatory authority over the in-state facilities that link the end-user to the larger interstate pipeline. The state would certainly have substantial interests with respect to safety, for example, and the prospect of companies building and maintaining parallel, competing gas pipelines raises a number of local concerns of the sort that led to consolidation and regulation of local distribution monopolies a century or so ago. See generally *General Motors Corp. v. Tracy*, 519 U.S. 278, 288–90, 117 S.Ct. 811, 136 L.Ed.2d 761 (1997) (summarizing history of gas and electric competition and eventual regulation).[8]

U.S. at 289–90 & n. 5, 117 S.Ct. 811. In this case, the Scepter pipeline across another person's property to connect with the Midwestern pipeline reflects a first step in that direction, since Scepter was already connected to SIGECO's distribution system.

The fact that the Scepter pipeline crosses another person's property also raises the prospect of a related constitutional issue,

Defendants' position also finds significant support in the Supreme Court's 1997 opinion in *General Motors Corp. v. Tracy*. The specific issue before the Court was whether Ohio had violated the dormant Commerce Clause by imposing different taxes on purchases of gas from local distribution companies and purchases from any other seller, such as producers and independent marketers who tended to be located in other states. The effect of the challenged tax was to tax bypass sales to large industrial customers, such as General Motors. The Supreme Court upheld Ohio's tax in an opinion that reviewed the evolution of natural gas markets and regulatory efforts. The Court wrote:

[H]alf a century ago we concluded that the NGA altogether exempts state regulation of retail sales of natural gas (including in-state sales to large industrial customers) from the strictures of the dormant Commerce Clause, see *Panhandle Eastern Pipe Line Co. v. Public Serv. Comm'n of Ind.*, 332 U.S. 507, 68 S.Ct. 190, 92 L.Ed. 128 (1947), and to this day, notwithstanding the national regulatory revolution, Congress has done nothing to limit its unbroken recognition of the state regulatory authority that has created and preserved the

which is whether property for such bypass pipelines could be taken by the power of eminent domain as a taking for a "public use." The Supreme Court has repeatedly stated that "one person's property may not be taken for the benefit of another private person without a justifying public purpose, even though compensation be paid." *Hawaii Housing Auth. v. Midkiff*, 467 U.S. 229, 241, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984), quoting *Thompson v. Consolidated Gas Utilities Corp.*, 300 U.S. 55, 80, 57 S.Ct. 364, 81 L.Ed. 510 (1937) (state's order requiring gas well owners with pipeline connections to purchase gas from other well owners without pipeline connections amounted to unconstitutional taking for private purpose); accord, *e.g.*, *Cincinnati v. Vester*, 281 U.S. 439, 447, 50 S.Ct. 360, 74 L.Ed. 950 (1930) (city could not condemn private property without basis for finding the taking would serve public purpose; city's possible future sale of such property to others could not justify taking); *Fallbrook Irrigation Dist. v. Bradley*, 164 U.S. 112, 159–63, 17 S.Ct. 56, 41 L.Ed. 369 (1896) (taking of land and formation of water districts for purposes of irrigation project were for public purpose where all persons similarly situated had right to use the water); *Missouri Pacific Ry. Co. v. Nebraska*, 164 U.S. 403, 416–17, 17 S.Ct. 130, 41 L.Ed. 489 (1896) (taking of railroad's land for operation of private grain elevator was unconstitutional taking of private property for private purpose where elevator was not available for use by public).

The power of a public utility to take private property has always been founded on the premise that the taking is reasonably necessary to provide a service to the general public. That premise requires that the facilities be available to all similarly situated members of the public. See, *e.g.*, *Gradison v. Ohio Oil Co.*, 239 Ind. 218, 156 N.E.2d 80, 85–86

(1959) (oil pipeline could exercise power of eminent domain because it is "compelled to and does accept oil from any shippers"); *Department of Treasury v. City of Linton*, 223 Ind. 363, 60 N.E.2d 948, 951 (1945) (privately owned utilities may exercise power of eminent domain "because the use they will make of the property is a public use"); *Westport Stone Co. v. Thomas*, 175 Ind. 319, 94 N.E. 406, 408 (1911) (upholding right to condemn property to build branch rail line where public would have legal right to use it without discrimination); see also *Wisconsin Central Ltd. v. Public Service Comm'n*, 95 F.3d 1359, 1367–68 (7th Cir.1996) (regarding public utilities' powers to take property rights from railroads); *Great Northern Ry. Co. v. Chicago, St. P., M. & O. Ry. Co.*, 78 S.D. 168, 99 N.W.2d 439, 443 (1959) (one railroad could use eminent domain to cross another railroad's property to construct spur line because the spur line was "denied to no industry which it is reasonably feasible for the spur to serve"). If a railroad, road, or pipeline is built for purely private use and is not generally available to the public, any taking necessary to complete the project would not be a taking for a "public use." See, *e.g.*, *Continental Enterprises, Inc. v. Cain*, 180 Ind.App. 106, 387 N.E.2d 86, 90–91 (1979).

There is no indication here that eminent domain (or the prospect of its use) was used to obtain the right to build the pipeline across the neighboring property. However, it is difficult to see how property could be taken by eminent domain to construct a pipeline like Scepter's connection to Midwestern if only Scepter may use it. If, on the other hand, the pipeline were available for others to use, it is difficult to see how Midwestern would not then be engaged in the "local distribution" of gas under *any* definition of the term.

local monopolies. *The clear implication is that Congress finds the benefits of the bundled product for captive local buyers well within the realm of what the States may reasonably promote and preserve.* 519 U.S. at 304–05, 117 S.Ct. 811 (footnote omitted; emphasis added). The Court further explained:

This Court has also recognized the importance of avoiding any jeopardy to service of the state-regulated captive market, and in circumstances remarkably similar to those of the present case. In *Panhandle Eastern Pipe Line Co. v. Michigan Pub. Serv. Comm'n,* 341 U.S. 329, 71 S.Ct. 777, 95 L.Ed. 993 (1951), Ford Motor Company had entered a contract with an interstate pipeline for supply of gas at Ford's plant in Dearborn, Michigan, thus bypassing the local distribution company [LDC]. The Michigan Public Service Commission ordered the pipeline to cease and desist from making direct sales of natural gas to the State's industrial customers without a certificate of public convenience and necessity, and the pipeline brought a Commerce Clause challenge to the commission's action. The Court observed that

"[a]ppellant asserts a right to compete for the cream of the volume business without regard to the local public convenience or necessity. Were appellant successful in this venture, it would no doubt be reflected adversely in [the LDC's] over-all costs of service and its rates to customers whose only source of supply is [the LDC]. This clearly presents a situation of . . . vital interest to the State of Michigan." *Id.,* at 334, 117 S.Ct. 811.

In view of the economic threat that competition for large industrial consumers posed to gas service to small captive users, the Court again reaffirmed its longstanding doctrine upholding the States' power to regulate all direct instate sales to consumers, even if such regulation resulted in an outright prohibition of competition for even the largest

end users. *Id.,* at 336–337, 117 S.Ct. 811; see also *Panhandle–Indiana, supra* (upholding state regulation of direct sales to large industrial users as not preempted by the NGA or precluded by the dormant Commerce Clause).

519 U.S. at 305–06, 117 S.Ct. 811.

From the end of this quoted passage hangs footnote 14 of the Court's opinion, which has considerable significance for defendants because it addresses the principal circuit court cases relied upon by Midwestern and FERC on the issue of jurisdiction over bypass arrangements. The Supreme Court wrote:

Under today's altered market structure, see *supra,* at 283–85, 117 S.Ct. 811, several Courts of Appeals have held that the NGA confers jurisdiction on FERC, rather than the States, to regulate such bypass arrangements for supplying gas to large industrial consumers when the sale of gas itself occurs outside the State and an interstate pipeline merely transports the gas to the industrial consumer for delivery in-state. See *Cascade Natural Gas Corp. v. FERC,* 955 F.2d 1412, 1414–1422 (C.A.10 1992); *Michigan Consolidated Gas Co. v. Panhandle Eastern Pipe Line Co.,* 887 F.2d 1295, 1299–1301 (C.A.6 1989), *cert. denied,* 494 U.S. 1079, 110 S.Ct. 1806, 108 L.Ed.2d 937 (1990); *Michigan Consolidated Gas Co. v. FERC,* 883 F.2d 117, 121–122 (C.A.D.C.1989), *cert. denied,* 494 U.S. 1079, 110 S.Ct. 1807, 108 L.Ed.2d 937 (1990). We express no view on the correctness of these decisions.

519 U.S. at 306 n. 14, 117 S.Ct. 811.

Midwestern correctly points out that the Supreme Court did not actually consider in *Tracy* the correctness of those decisions cited in footnote 14. However, for present purposes—deciding only whether the Indiana statutes authorizing jurisdiction over bypass arrangements are "flagrantly and patently" unconstitutional—the footnote has some significance because the Supreme Court did not observe that the cited circuit court decisions are obviously

correct in their efforts to distinguish the earlier *Panhandle* decisions based on the separation of the seller and transporter. It is not unreasonable to read footnote 14 as an invitation for further consideration of the issue flagged by the Court, especially coming at the end of a discussion of the two *Panhandle* decisions and the important interests states have in regulating direct sales to large industrial customers that bypass local distribution companies, regardless of whether seller and transporter are separate entities.[9]

From a practical standpoint, moreover, it appears that Midwestern's and FERC's logic would extend from the situation here, in which the operator of an interstate pipeline is delivering gas directly to two large industrial customers, to similar deliveries to three, or four, or a hundred industrial customers within a state. Midwestern could be building taps and individual pipelines for all of those customers all over the state. Yet, under Midwestern's and FERC's reasoning, all that activity would not amount to "the local distribution of natural gas," at least as long as the seller and the transporter were separate corporations. As the Supreme Court observed in the midst of its discussion of the *Panhandle* cases in *Tracy*, however, "notwithstanding the national regulatory revolution, Congress has done nothing to limit its unbroken recognition of the state regulatory authority that has created *and preserved* the local monopolies." 519 U.S. at 304–05, 117 S.Ct. 811 (emphasis added).

Midwestern's and FERC's reasoning opens a potentially huge breach in those state-regulated local monopolies, and it allows the interstate pipeline companies to skim what the Supreme Court called the "cream" of the business. *Panhandle–Indiana*, 332 U.S. at 521, 68 S.Ct. 190. Basing such a dramatic change in the regulatory jurisdiction over bypass arrangements on the difference between having one corporation handle both the sale and the delivery (which indisputably gives a state jurisdiction) and dividing the sale and delivery transactions between two separate corporations (which could even be two wholly-owned subsidiaries of the same parent corporation) does not appear to be the only reasonable reading of the Natural Gas Act. After all, the Act was intended only to fill a regulatory gap, not to replace existing state regulatory jurisdiction with federal power.

The Supreme Court's understanding of the Natural Gas Act as a measure to fill a regulatory gap rather than to exercise the full scope of the federal commerce power also answers Midwestern's reliance on the Supreme Court's statement in *Maryland v. Louisiana* that: "Gas crossing a state line at any stage of its movement to the ultimate consumer is in interstate commerce during the entire journey." 451 U.S. at 755, 101 S.Ct. 2114; see also, *e.g., Cascade Natural Gas*, 955 F.2d at 1417, quoting *Maryland v. Louisiana*. The Supreme Court's observation in *Maryland v. Louisiana* was part of the reasoning supporting its conclusion that Louisiana's "First–Use Tax" on natural gas discriminated against interstate commerce. The Court was not addressing in that case the Natural Gas Act's boundary between fed-

**9.** Defendants argue further that FERC's approach to bypass arrangements that involve separate sellers and transporters reduces to mere surplusage the specific exemption in the Natural Gas Act for "the local distribution of natural gas." 15 U.S.C. § 717(b). Midwestern essentially concedes as much, but it relies on evidence that Congress in fact intended the phrase to be surplusage. See H.R.Rep. No. 75–709, at 3 (1st Sess.1937) (phrase "the local distribution of natural gas" was "not actually necessary," but because similar language had been included in previous bills, it was left in

the act to avoid "the contention, however unfounded, that the elimination of the negative language would broaden the scope of the act"), quoted with approval in *Federal Power Comm'n v. Louisiana Power & Light Co.*, 406 U.S. 621, 637 n. 14, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972). SIGECO points out that the House Report simply assumed that all distribution would be associated with a sale, so that it offers little guidance as to how the act should be applied when sale and distribution are separated, as they sometimes have been in recent years.

eral and state jurisdiction. If Congress chose to exercise the full scope of its Commerce Clause power, there is little doubt that Congress could choose to regulate gas sales and transportation from origin to the ultimate consumer. That is evident from the fact that, both prior to and under the Natural Gas Act, the Court has allowed states to regulate some matters that the Court specifically identified as involving interstate commerce in natural gas. See, e.g., *Panhandle–Michigan*, 341 U.S. at 333–35, 71 S.Ct. 777; *Panhandle–Indiana*, 332 U.S. at 512, 514–16, 68 S.Ct. 190; *Pennsylvania Gas Co. v. Public Service Comm'n*, 252 U.S. 23, 31, 40 S.Ct. 279, 64 L.Ed. 434 (1920).

The central point, however, is that Congress did not choose to exercise its full Commerce Clause power when it enacted the Natural Gas Act. It chose instead to exercise its power only where the Supreme Court had held that states could not act. Thus, one might decide a jurisdictional question under the act by asking whether, if FERC did not exist at all, a state government could regulate the transaction or equipment in question. If the answer is yes, then federal authority is not needed. If the answer is no, then the federal agency would have jurisdiction.

Under this approach, there is little doubt that a state would have the authority to regulate the delivery of gas to an end-user in that state, regardless of where the gas was purchased. The Supreme Court said as much in a case decided before the Natural Gas Act, *Missouri ex rel. Barrett v. Kansas Natural Gas Co.*, 265 U.S. 298, 44 S.Ct. 544, 68 L.Ed. 1027 (1924), where the Court distinguished between distribution of gas for resale, which was held beyond the reach of state regulation, and distribution of gas to end-users:

> The business of supplying, on demand, local consumers is a local business, even though the gas be brought from another State and drawn for distribution directly from interstate mains; *and this is so whether the local distribution be made by the transporting company or by independent distributing companies.* In such case the local interest is paramount, and the interference with interstate commerce, if any, indirect and of minor importance.

265 U.S. at 309, 44 S.Ct. 544 (emphasis added). The emphasized language, which was available to Congress when it enacted the Natural Gas Act, indicates that distribution directly to an end-user is "local distribution" that the end-user's state may regulate, even if the transaction originated in interstate commerce.[10]

Ultimately, however, in deciding whether *Younger* abstention is appropriate in this case, this court should not decide

---

10. A state's power to apply non-discriminatory laws to a local delivery of a product purchased in another state is by now well-established in Commerce Clause jurisprudence generally, although it was the subject of controversy in the 19th century, often debated then in terms of the "original package" doctrine. Under the original package doctrine, a state that outlawed the manufacture and sale of alcoholic beverages, for example, was barred by the Commerce Clause from regulating, prohibiting, or taxing local sales of alcoholic beverages brought from other states, so long as the beverages remained sealed in their "original packages." See *Leisy v. Hardin*, 135 U.S. 100, 10 S.Ct. 681, 34 L.Ed. 128 (1890) (applying original package doctrine to bar enforcement of state law barring sale of alcoholic beverages); *Brown v. Maryland*, 25 U.S. (12 Wheat) 419, 441–42, 6 L.Ed. 678 (1827) (striking down state tax on importers of all kinds of goods and providing source of "original package" doctrine); see generally *Bridenbaugh v. Freeman–Wilson*, 227 F.3d 848, 852 (7th Cir.2000) (reviewing history of "jettisoned" original package doctrine for purposes of interpreting Twenty-first Amendment). The original package doctrine was dead long before it was formally overruled in *Michelin Tire Corp. v. Wages*, 423 U.S. 276, 96 S.Ct. 535, 46 L.Ed.2d 495 (1976). It is clear that a state may apply non-discriminatory laws to tax, regulate, or prohibit transactions or activities within its borders even if they originate in interstate commerce. See, e.g., *McGoldrick v. Berwind–White Coal Mining Co.*, 309 U.S. 33, 60 S.Ct. 388, 84 L.Ed. 565 (1940) (upholding tax on sale of coal shipped into taxing state by seller).

which side should prevail in the underlying debate over regulatory jurisdiction. The issue presented by Midwestern's argument is only whether the result of that debate is so clear that any effort by the Indiana Commission to exercise jurisdiction over Midwestern's bypass arrangements with GPC and Scepter would be "flagrantly and patently" unconstitutional. As the foregoing discussion should indicate, that question is easy to answer, and the answer is no.

Jurisdictional debates over gas regulation under the Commerce Clause and the Natural Gas Act have a long and complex history. The circuit courts cited by Midwestern have acknowledged the difficulty of the question and have recognized that their decisions were necessarily in tension with at least some Supreme Court opinions, just as the opposite result would produce similar tension with other Supreme Court opinions.

In this court's view, the Indiana Commission and Indiana courts are free to evaluate the authorities and the arguments and to make their own decision about whether Indiana may exercise jurisdiction over these bypass arrangements. Any

party disappointed with the state's resolution of any issue of federal law is free to seek review from the Supreme Court of the United States.

## 2. *Dormant Commerce Clause*

■■■ Midwestern also argues that the Indiana statutes regulating bypass arrangements "flagrantly and patently" violate the dormant Commerce Clause because they discriminate against interstate commerce. The standard for the unconstitutionality of a state statute to invoke this exception to *Younger* is high. The challenged statute must be "flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it." *Younger*, 401 U.S. at 53–54, 91 S.Ct. 746, quoting *Watson v. Buck*, 313 U.S. 387, 402, 61 S.Ct. 962, 85 L.Ed. 1416 (1941); accord, *Moore*, 442 U.S. at 424, 99 S.Ct. 2371; *Juidice*, 430 U.S. at 338, 97 S.Ct. 1211.

Midwestern bases its dormant Commerce Clause argument on Ind.Code § 8–1–2–87.6.[11] Section 87.6(a) effectively ex-

---

11. Section 87.6 provides in full:

(a) Except as provided in this section, the production, gathering, sale, or transportation of Indiana produced natural gas is exempt from this chapter.

(b) Any person, corporation, or other entity engaged in the production, gathering, sale, or transportation of natural gas produced in Indiana may petition the commission to:

(1) require a gas utility certified under section 86 or 87 of this chapter to purchase or transport Indiana produced natural gas owned by the petitioning entity; and

(2) set the rates for the purchase or transportation of that gas.

(c) Upon receiving a petition under subsection (b), the commission may order the gas utility to transport or purchase the gas, and shall conduct a public hearing to set the purchase or transportation rates. The commission may only require the purchase or transportation of Indiana produced natural gas that:

(1) is of pipeline quality and reliability; and

(2) is to be delivered to a facility of the transporting or purchasing local distribution company that has adequate capacity to accept and transport the volume of gas involved.

The commission shall provide notice of the hearing in accordance with IC 8–1–1–8. The commission shall prescribe the form of the petition, the procedures for the hearing, and the parties to whom notice is to be sent.

(d) If the sale of Indiana produced natural gas to an end use consumer for consumption in the franchise territory of a gas utility with less than five thousand (5,000) customers detrimentally affects the other end use consumers in the utility's franchise territory, the utility may petition the commission to require the seller to instead sell the gas to that utility at a rate and under terms and conditions set by the commission.

(e) Any interested party may appear at a hearing conducted under subsections (c) and (d) either in person or by attorney and offer evidence in support of or in opposition to the petition. The commission may conduct an investigation and introduce any evidence ob-

cludes "Indiana produced natural gas" from the terms of Sections 87 and 87.5. Midwestern contends this exclusion shows that Sections 87 and 87.5 embody "flagrantly and patently" unconstitutional discrimination against interstate commerce, which should justify in turn an exception to *Younger* abstention. The court disagrees.

Read as a whole, Section 87.6 authorizes the Indiana Commission to impose extensive regulatory controls over "Indiana produced natural gas" and those who produce, gather, sell, or transport it. The statute authorizes the Commission to require public utilities in Indiana to buy Indiana-produced gas if certain conditions are met. Any such order that barred a utility from buying out-of-state gas would raise questions under the dormant Commerce Clause, of course, at least if a producer or seller of out-of-state gas raised the question. However, there is no evidence that the Commission has issued any such order. In addition, the defendants contend that Section 87.6 is essentially an exercise of jurisdiction over Indiana-produced gas that complements federal regulation over interstate aspects of the gas business. That argument is not frivolous. This court cannot decide on the sparse record in this case that Section 87.6 has had any effects at all, let alone that it violates the Constitution so "flagrantly and patently" that *Younger* abstention would not be appropriate here.

Defendants also argue that, if Section 87.6 presents any Commerce Clause problem at all, it is because it favors producers of Indiana gas over producers of gas elsewhere. Midwestern is not a producer or seller of gas. It merely transports gas, and it has not shown how Section 87.6 places it at any disadvantage.

Finally, all Indiana statutes are subject to a severability clause. See Ind.Code § 1–1–1–8; *Alliance for Clean Coal v. Bayh*, 888 F.Supp. 924, 937 (S.D.Ind.1995),

*aff'd*, 72 F.3d 556 (7th Cir.1995). Even if Section 87.6 were deemed unconstitutional or were deemed to render Sections 87 and/or 87.5 unconstitutional (which are questions this court need not decide for purposes of deciding whether *Younger* abstention is appropriate), the Indiana courts could easily cure the problem by severing the offending provision and applying Sections 87 and 87.5 regardless of the source of the gas in question. That possibility weighs heavily in favor of *Younger* abstention so that the Indiana courts may address that issue of state law. The mere existence of Section 87.6 in the Indiana Code does not mean that Sections 87 and 87.5 "flagrantly and patently" violate the dormant Commerce Clause.

### 3. The Proposed "Relitigation" Exception to Younger Abstention

 In an argument related to its assertion that the Indiana laws are "flagrantly and patently" unconstitutional, Midwestern argues that the court should recognize an exception to *Younger* abstention where the state proceedings in question amount to an effort to relitigate rights already decided through federal channels. Midwestern relies on FERC's explicit approval of the bypass arrangements with both GPC and Scepter.

The short answer to this argument is that the Indiana Commission was not a party to the FERC proceeding. It is not bound by any conclusions FERC reached about the boundary between FERC's and the Indiana Commission's jurisdictions. The Indiana Commission has the authority to pursue enforcement proceedings on its own initiative. See Ind.Code §§ 8–1–2–58 to –60 & –115. Thus, even if Midwestern were correct in saying that SIGECO should not be allowed to bring a collateral challenge to FERC's ruling, the Indiana Commission would be entitled to pursue the enforcement actions pending before it.

---

tained as a result of the investigation at the hearing.

(f) The commission may adopt rules under IC 4–22–2 to implement this section.

See generally *Kerr–McGee Chemical Corp. v. Hartigan*, 816 F.2d 1177, 1180 (7th Cir. 1987) (affirming denial of injunction to bar state court action brought by state; prior federal court decision had no preclusive effect where state had participated in case only as an amicus curiae but was not a party).[12]

Midwestern also relies heavily on *Williams Natural Gas Co. v. Oklahoma City*, 890 F.2d 255 (10th Cir.1989), to avoid *Younger* abstention. In *Williams Natural Gas*, an interstate pipeline company had sought FERC approval for a bypass arrangement with a large industrial customer. The local distribution company had objected before FERC, arguing that FERC lacked jurisdiction and that state approval was required. FERC disagreed and issued a certificate under federal law authorizing the construction of a 12-mile pipeline extension to provide the bypass service. In the meantime, the local distribution company pursued an action in state court that resulted in an injunction against Williams Natural Gas prohibiting construction of the pipeline extension. Williams Natural Gas then sought a federal injunction against the state court action and injunction. The federal district court denied the injunction and held that it lacked jurisdiction to review the state court's decision because of the *Rooker–Feldman* doctrine. See *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 415–16, 44 S.Ct. 149, 68 L.Ed. 362 (1923); *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983).

The Tenth Circuit reversed and directed the district court to enjoin enforcement of the state court injunction. 890 F.2d at 264. The Tenth Circuit concluded that the local distribution company's exclusive avenue for challenging FERC's issuance of a certificate was the judicial review provision of the Natural Gas Act itself, in 15 U.S.C. § 717r. The state court action was therefore an improper collateral attack on the FERC certificate.

*Williams Natural Gas* is different from this case in one important respect. In *Williams Natural Gas*, the state regulatory body was not a party to the FERC proceedings, nor was it a party to the state or federal court litigation that ultimately resulted in an injunction against further litigation. In this case, of course, the Indiana Commission was not a party to the FERC proceedings, and the Indiana Commission itself is the governmental body pursuing the issue of enforcing Indiana law as it applies to Midwestern and its bypass customers. In *Williams Natural Gas*, therefore, the Tenth Circuit was directing entry of an injunction against collateral litigation by a party who had appeared before FERC and had lost. The court had no occasion to address in that case whether state utility regulators could be barred from pursuing their own investigation and enforcement proceeding because of the result of a FERC proceeding in which the state regulators played no part. In this case, the Indiana Commission is authorized by law to investigate and pursue on its own initiative possible violations of Indiana law relating to public utilities. This court sees no support for Midwestern's bold assertion that, in the dual federal-state system of regulating the natural gas business, state regulators must either intervene before FERC or passively and quietly accept FERC's decisions.[13]

---

12. The court expresses no view on whether certification proceedings before FERC are legislative in nature (like Indiana proceedings on necessity certificates), so that issue preclusion would not be applicable even to parties. See *United States v. Utah Construction & Mining Co.*, 384 U.S. 394, 422, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966); *Meyer v. Rigdon*, 36 F.3d 1375, 1379–80 (7th Cir.1994) (administrative decisions will be given issue-preclusive effect only if the agency acted in a judicial capacity).

13. Midwestern has also framed essentially the same argument in terms of issue preclusion, arguing that SIGECO should be bound by the doctrine of issue preclusion because it raised the same arguments on the merits before FERC, lost in that forum, and chose not to appeal to a federal court of appeals. This

*Conclusion*

Accordingly, pursuant to the principles of comity and federalism embodied in *Younger v. Harris,* the court grants defendants' motions to dismiss. The court does not reach the other abstention doctrines argued by the Commissioners. All other pending motions are denied as moot. Final judgment shall be entered.

So ordered.

court has not tried to reach any conclusions on the question of issue preclusion as applied to SIGECO because, in any event, there would be no basis for applying issue preclusion to the Indiana Commission. The Commission was not a party to the FERC proceeding. Midwestern has not offered any basis for concluding that a state commission may be barred by the doctrine of issue preclusion from making its own decision on a matter that FERC has decided in a proceeding to which the state commission was not a party.

In addition, even SIGECO did not participate in the FERC proceedings concerning Midwestern's bypass arrangements with Scepter. There appears to be no basis for barring the Indiana Commission from pursuing the two docketed matters relating to the Scepter arrangement.